# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIBERTY FUND, INC.,

      Petitioner,

      v.

      **Civil Action No.  04-0915 (JDB)**
      **(and consolidated cases No. 05-142, 05-144, 05-145,**
      **05-147, 05-148, 05-149, 05-150, 05-156, 05-258,**
      **05-259, 05-260, 05-261, 05-262, and 05-412 )**

ELAINE CHAO, Secretary of Labor, et al.

      Respondents.

## <u>MEMORANDUM OPINION</u>

Petitioners in these consolidated cases are several employers who are awaiting action on

their applications for permanent labor certifications on behalf of various aliens pursuant to the

Immigration and Nationality Act, 8 U.S.C. § 1182(a)(5)(A).  Also included among the petitioners

are some of the affected aliens. Petitioners allege that the U.S. Department of Labor has

unreasonably delayed the processing of the applications for as long as four years, and seek writs

of mandamus to compel action on the applications pursuant to the Mandamus Act, 28 U.S.C.

§ 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 555(b) and 706(1).  Respondents

move to dismiss or, in the alternative, for summary judgment, on the ground that petitioners have

failed to satisfy the elements required for the extraordinary relief of mandamus.  Petitioners have

filed a cross-motion for summary judgment.[1]  The Court held a hearing on the motions on

September 9, 2005.  For the reasons explained below, the Court grants respondents' motion for

summary judgment and denies petitioners' cross-motion.

---

[1]  For ease of reference, this opinion refers to respondents' memorandum in support of their motion as "Respt.'s Mem." and petitioners' memorandum in support their motion as "Petr.'s Mem."

## BACKGROUND

I.      **Statutory and Regulatory Background**

The Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq., regulates the admission

of aliens into the United States, and designates the Secretary of Homeland Security and the

Secretary of State as the principal administrators of its provisions.  See 8 U.S.C. §§ 1103, 1104.

It sets up a multi-step process for the issuance of permanent resident cards -- commonly referred

to as "green cards" -- to those aliens seeking permanent legal status in the United States based

upon employment here.  A significant role is assigned to the Secretary of Labor under 8 U.S.C.

§ 1182(a)(5)(A) to determine whether certain labor market conditions are met through issuance

of a "labor certification" covering each alien seeking a work visa:

> (i) In general
>       Any alien who seeks to enter the United States for the purpose of performing
> skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined
> and certified to the Secretary of State and the Attorney General that --
>       (I) there are not sufficient workers who are able, willing, qualified . . . and
>       available at the time of application for a visa and admission to the United States
>       and at the place where the alien is to perform such skilled or unskilled labor, and
>       (II) the employment of such alien will not adversely affect the wages and working
>       conditions of workers in the United States similarly employed.

The Department of Labor has issued regulations governing labor certification at 20 C.F.R. part

656 (2004).[2]  Pursuant to the regulations in effect at the time of these administrative proceedings,

---

[2]  All citations to 20 C.F.R. part 656 are to the 2004 version except where otherwise
noted.  The Department of Labor revised the regulations, effective March 28, 2005.  See 69 Fed.
Reg. 77326, 77326 (Dec. 27, 2004).  However, the preamble specifies that "[a]pplications filed
before this rule's effective date will continue to be processed and governed by the current
regulation," which it defines as the part 656 regulations published in the April 2004 version of
the Code of Federal Regulations.  Id.  Because the dates of the applications in these cases are
from 2001 to 2003, the 2004 regulations govern.  The parties' briefs indicate they agree with this
approach.

an employer seeking a labor certification was required to file an application with the appropriate state employment service office (also referred to as a state workforce agency, or "SWA"), which was required to review the application for completeness, calculate the prevailing wage, and facilitate recruitment of U.S. workers for the job opportunity.  Id. § 656.21(a), (d)-(f).  Following a recruitment period, the SWA would transmit the application to the appropriate regional or national "certifying officer" at the Department of Labor.  Id. § 656.21(k), 656.24(a).  The recruitment efforts could be reduced, subject to approval by a certifying officer, if the employer satisfactorily documented that the employer had adequately tested the labor market with no success at the prevailing wage and working conditions.  Id. 656.21(i).  Such applications are referred to as "reduction in recruitment,"or "RIR," applications.

The governing regulations further provide that the "Certifying Officer . . . shall make a determination either to grant the labor certification or to issue a *Notice of Findings*," applying certain criteria.  Id. § 656.24(b).  A notice of findings that does not grant the labor certification is required to state the specific bases on which the decision was made and notify the employer that it has 35 days to cure the defects or otherwise rebut the bases of the determination.  Id. § 656.25(c).  If a timely rebuttal is submitted, the Certifying Officer is required either to grant or deny the labor certification pursuant to the standards set forth in § 656.24(b) in a "final determination" reviewable by the Board of Alien Labor Certification Appeals.  Neither the Act nor the part 626 regulations establishes a deadline for the issuance of the initial Notice of Findings or the subsequent Final Determination.

After an employer obtains a labor certification, it may then submit an immigration petition for alien worker (commonly referred to as Form I-140) to the Bureau of Citizenship and

Immigration Services ("CIS").  8 C.F.R. § 204.5.  Pursuant to Department of State regulations

governing issuance of visas, the alien separately must submit an application for an immigrant

visa to the appropriate consular office having jurisdiction over the alien's place of residence.  See

22 C.F.R. § 42.61.  The number of visa allotments is limited for each employment category

pursuant to 8 U.S.C. § 1153(b) and Department of State regulations.[3]  An immigrant visa may not

be issued until the consular office is in receipt of the labor certification from the Secretary of

Labor.  Id. § 1153(b)(3)(C).

## II.      Factual Background

The process for alien labor certification has been plagued by extensive delays for many

years.  This has resulted from the confluence of several events, as explained in detail in the

declaration of William Carlson, Director of the Division of Foreign Labor Certification at the

Department of Labor (Respt.'s Mem. Ex. A).  In the 1997 fiscal year, Congress reduced the

amount of funds provided to the states for processing alien labor certifications from $47 million

to $31 million, a reduction of 34 percent.  Carlson Decl. ¶ 5.  At the same time, economic

expansion produced record numbers of requests for alien workers in all labor certification

programs:  permanent, temporary professional (H-1B), temporary agricultural (H-2A), and

temporary non-agricultural (H-2B).  Id.

In FY 1998, Congress amended Section 245(i) of the Immigration and Nationality Act,

_____

[3] Petitioners state that the visa allotment relevant to the aliens affected in these cases is
the third category set forth at 8 U.S.C. § 1153(b)(3).  This provision sets limits on the number of
visas available for skilled workers, professionals holding baccalaureate degrees, and "other
workers" performing unskilled labor.

8 U.S.C. § 1255(i), to allow unlawful aliens to adjust their status to that of lawful permanent

residency upon the payment of a penalty filing fee and the filing of an application for permanent

labor certification by January 14, 1998.  Pub. L. No. 105-119, 111 Stat. 2440, 2458 (Nov. 26,

1997); Carlson Decl. ¶ 6.  This resulted in the receipt of over 100,000 new applications for labor

certification in FY 1998 alone.  Carlson Decl. ¶ 6.  In 2000, Congress made the same opportunity

available to unlawful aliens for the period running from December 21, 2000, through April 30,

2001, which again was conditioned upon, inter alia, the filing of an application for permanent

labor certification before the deadline.  Pub. L. No. 106-554, 114 Stat. 2763, 2763A-324 (Dec.

21, 2000); Carlson Decl. ¶ 7.  In response, state workforce agencies received 247,406 new cases

in FY 2001.  Carlson Decl. ¶ 7.  Even with the expiration of Section 245(i), the caseload

continued to grow, as states received more applications than they could process.  Id. ¶ 8.

Although the number of applications for permanent labor certification increased,

Department of Labor staffing did not.  In FY 1997, the regional staffing level for alien labor

certification cases was the equivalent of 78 full-time employees, where it remained through FY

1999.  Id. ¶ 9.  At the same time, the Department of Labor was also faced with an increase in

cases in other labor certification programs -- the H-1B visa program for temporary professionals

and the H-2B visa program for temporary non-agricultural workers.  Id. ¶¶ 10-11.  H-1B

applications increased over 300 percent from FY 1994 to FY 1999, and peaked at over 350,000

applications.  Id. ¶ 10.  H-2B applications increased by almost 400 percent between FY 1998 and

FY 2003.  Id. ¶ 11.  The Department of Labor has a statutory duty to act on H-1B cases within

seven days of receipt (8 U.S.C. § 1182(n)(1)), and pursuant to internal policy guidelines, must

process H-2B cases within 60 days of receipt by an SWA.  Id. ¶¶ 10-11.  Thus, the Department of

Labor gives precedence to H-1B and H-2B cases over applications for permanent labor certification. Id. ¶ 11.  Indeed, as respondents candidly acknowledge, in order to comply with the statutory deadline for H-1B applications, "there were periods during FY 1997 and 1998 when all regional labor certification staff was required to process H-1B applications, leaving little or no time to process permanent cases."  Id. ¶ 10.

In FY 1999 and FY 2000, the Department of Labor took several steps to assist its regional offices in processing permanent cases:

- Automated systems were implemented to process H-1B labor certifications by fax and through an on-line web-enabled system, allowing the regional offices to assign more staff to permanent cases.
- Additional funding in the amount of $500,000 was allocated to overtime and hiring temporary staff to process permanent cases.
- A private company was hired to review the processing of permanent cases and make recommended program improvements to reduce the backlog.

Id. ¶¶ 13-14.  Nonetheless, as of FY 2003, the permanent case backlog remained substantial, with 265,163 applications at the state level and 50,498 at the Department of Labor regional level. Id. ¶ 12.

In July 2004, the Department of Labor authorized the creation of two "backlog centers" -- one in Philadelphia and one in Dallas -- dedicated to processing and eliminating the backlog of applications for permanent labor certifications.  Id. ¶ 15; see also 69 Fed. Reg. 43716 (July 21, 2004).  The backlog centers combine the state and regional processes in one location, and are staffed by approximately 200 employees.  Id. ¶ 16.  The centers process the applications on a "first-in, first-out" basis, in the order of their priority dates -- that is, the date an application is filed with an SWA -- with some exceptions arising from the physical transition of the backlogged applications to the centers.  See U.S. Department of Labor, "Permanent Labor Certification

Program, Backlog Processing, Frequently Asked Questions" at 2, 5 (Respt.'s Reply Mem. Ex. 1).

Because each application must be entered into the "permanent backlog system" at the backlog

centers to receive a priority date, id., the simultaneous process of entering applications into the

system and rendering decisions on applications leads to some exceptions to an otherwise "first-in,

first-out" approach.  Additionally, each applicant is sent a "center receipt notification letter"

along with a "Selection of Continuation Option Letter," requiring the applicant to notify the

Department whether it wishes to continue the processing of the application (which presumably is

in question due to the years of delay).  Id. at 2.  The Department does not take action on an

application until it is in receipt of the applicant's response, id., which also leads to some

exceptions to the first-in, first out approach.

In December 2004, the Department finalized changes to the part 656 regulations which

reengineered and streamlined the filing and processing of permanent cases and eliminated the

role of SWAs as the intake point for submissions and initial processing.  See Carlson Decl. ¶ 17

(citing 69 Fed. Reg. at 77326).  Although the changes are not directly applicable to applications

filed before the rule revisions (see supra note 2), it is anticipated that, on a going forward basis,

the changes "will yield a large reduction in the average time needed to process labor certification

applications."  69 Fed. Reg. at 77328.

The petitioner employers and affected aliens in these consolidated cases have had

applications for permanent labor certification pending at the backlog centers for two to four

years, as follows:

- •     On April 30, 2001, Bowie Town Medical Practice filed an application on behalf
        of alien Ezra Harrison for employment as a licensed practical nurse.

- On April 30, 2001, Queensway Foods, Inc., filed an application on behalf of alien Abiodun Osilesi for employment as a foreign foods specialty cook.

- On February 6, 2002, Liberty Fund, Inc., filed an application on behalf of alien Claire Morgan for employment as a program officer regarding certain academic programs.

- On March 25, 2002, All American Home Services, LLC, filed an application on behalf of alien Aisha Hasham for employment as a secretary.

- On May 9, 2002, Shiv Traders, Inc., filed an application on behalf of alien Mineshkhumar J. Patel for employment as a night manager.

- On May 31, 2002, HSR, Inc., filed an application on behalf of alien Dipakkumar Patel for employment as a night manager.

- On July 29, 2002, Alfredo Valverde filed an application on behalf of alien Marcella Theresa Smith for employment as a child monitor.

- On December 2, 2002, Saraswati, Inc., filed an application on behalf of alien Dineshkhumar S. Patel for employment as a manager.

- On December 9, 2002, GC Café Arlington, LLC filed an application on behalf of alien Kiran Malakar for employment as an Indian specialty cook.

- On January 27, 2003, ZEK, Inc., filed an application on behalf of alien Asma Karim for an unidentified position.

- On February 10, 2003, Pisces, Inc., filed an application on behalf of Nezha Benmana Thomalla for employment as a shampooer.

- On June 13, 2003, International Ceramica, Inc., filed an application on behalf of alien Farhad Hemmat for employment as a sales representative.

Petr.'s Statement of Material Facts As To Which There Is No Genuine Dispute at 23-27;

Employers' Declarations (Petr.'s Mem. Ex. 1).[4]  Three other employers -- North Carolina

---

[4] Petitioners' statement of undisputed material facts states that All American Home Services filed its application on March 25, 2003, but the declaration submitted by the employer and the petition for writ of mandamus state that the filing date was March 25, 2002.  See Decl. of Veronica Mitchell ¶ 3; Petition ¶ 6 and Ex. A  For the purpose of resolving the pending motions,

(continued...)

Hospitality Group, Heritage Contracting LLC and Abdul Gaffar -- who filed petitions for writs of mandamus have received approval of their applications while these actions have been pending in court.[5]  All of the petitioner employers have undertaken recruitment efforts to enable processing of their applications more quickly as RIR applications. Petr.'s Statement of Material Facts As To Which There Is No Genuine Dispute ¶ 18; Employer Declarations *passim*.  All of the foregoing employers also have been sent continuation letters, with the exception of All American Home Services, and are thus in the RIR queue awaiting processing by their priority dates at one of the backlog centers, in accordance with the process outlined above.  See Decl. of Letitia Sierra ¶¶ 6-7 (filed Sept. 8, 2005) ("First Sierra Decl."); Second Sierra Decl. ¶ 4 (filed Sept. 14, 2005).

The Department of Labor currently estimates that RIR applications with a priority date between April 1, 2001 and April 1, 2002 will be processed within 12 months, and those with a priority date between April 1, 2002 and April 1, 2003 will be processed within 18 months.  First Sierra Decl. ¶¶ 11-12; Second Sierra Decl. ¶¶ 7-8.  As of last month -- mid-August 2005 -- the Department of Labor was processing RIR applications with priority dates in the 2001 and 2002 time frames, with "most" having priority dates of late April 2001.  First Sierra Decl. ¶ 9; Second Sierra Decl. ¶ 5.  These projections indicate that all of the pending applications at issue in this litigation, except for one filed in June 2003, will be processed within 18 months or less.

---

[4](...continued)
the Court construes the facts in the light most favorable to petitioners, and assumes that the filing date was March 25, 2002.

[5]  The petitioners in those cases have requested dismissal or withdrawal from this action. The Court agrees that dismissal in those cases is appropriate and so provides in the order accompanying this opinion.

Petitioners presently seek writs of mandamus to compel respondents to take prompt

action on their applications.  They purport not to desire to jump ahead of other RIR applications

in the queue at the backlog centers, but only to expedite processing of all applications.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), the petitioner bears the burden of establishing that the

court has jurisdiction.  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9,

13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the

scope of its jurisdictional authority"); see also Pitney Bowes, Inc. v. United States Postal Serv.,

27 F. Supp. 2d 15, 18 (D.D.C. 1998).  Although a court must accept as true all the factual

allegations contained in the petition when reviewing a motion to dismiss pursuant to Rule

12(b)(1), see Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S.

163, 164, (1993), the court need not accept legal conclusions as true,  Boyd v. O'Neill, 273 F.

Supp. 2d 92, 95 (D.D.C. 2003).  Furthermore, "'plaintiff[s'] factual allegations in the [petition]

. . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion

for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A CHARLES ALAN

WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350).  A court may

consider material other than the allegations of the petition in determining whether it has

jurisdiction to hear the case.  See Coalition for Underground Expansion v. Mineta, 333 F.3d 193,

198 (D.C. Cir. 2003); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n. 3

(D.C. Cir. 1997); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986).  Thus, "where

necessary, the court may consider the petition supplemented by undisputed facts evidenced in the

record." <u>Coalition for Underground Expansion</u>, 333 F.3d at 198 (quoting <u>Herbert v. Nat'l Acad.</u> <u>of Scis.</u>, 974 F.2d 192, 197 (D.C. Cir.1992)).

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  <u>See</u> <u>Celotex</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Id.</u> (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  <u>See</u> <u>Anderson v. Liberty Lobby,</u> <u>Inc.</u>, 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  <u>Id.</u> at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  <u>Celotex</u>, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

## ANALYSIS

The Mandamus Act states that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  Pursuant to the Act, a court may grant mandamus relief if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005); see Ganem v. Heckler, 746 F.2d 844, 852 (D.C. Cir. 1984) (noting that mandamus is "an extraordinary remedy [that] generally will not issue unless" these requirements are met) (citing Heckler v. Ringer, 466 U.S. 602, 616 (1984)).  Respondents move to dismiss for lack of subject matter jurisdiction or for failure to state a claim on the ground that petitioners have failed to establish the first element -- a clear right to the relief sought -- because there has been no unreasonable delay warranting mandamus.  Respondents' motion for summary judgment rests on the same ground.  Petitioners seek summary judgment on the ground that the delay of several years on the pending applications and the adverse impact on petitioners demonstrate unreasonable delay clearly warranting relief.

As a threshold matter, the Court will treat respondents' motion as one for summary judgment.  The Court clearly has jurisdiction to review a claim of unreasonable delay of agency action.  The Administrative Procedure Act requires an agency to act "within a reasonable time," 5 U.S.C. § 555(b), and authorizes a reviewing court to "compel agency action . . . unreasonably delayed," § 5 U.S.C. 706(1).  Whether petitioners have, in fact, demonstrated unreasonable delay -- and thus, a "clear right" to relief under the Mandamus Act -- is intertwined with the merits

12

inquiry, which the Court will thus consider through summary judgment based on the undisputed

material facts, as discerned from the parties' briefs and exhibits.

The leading case on the issue of unreasonable delay, <u>Telecommunications Res. and

Action Ctr. v. FCC</u>, 750 F.2d 70 (D.C. Cir. 1984) ("<u>TRAC</u>"), identifies six principles relevant to

determining whether agency delay is so unreasonable as to warrant mandamus:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason"; (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might
> be reasonable in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the effect of
> expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not "find any impropriety lurking
> behind agency lassitude in order to hold that agency action is 'unreasonably
> delayed.'"

<u>Id.</u> at 80 (citations omitted); <u>see</u> <u>also</u> <u>In re Barr Lab.</u>, 930 F.2d 72, 74-75 (D.C. Cir. 1991).  The

parties agree that this case is effectively controlled by application of these principles from <u>TRAC</u>.

Under the first and second <u>TRAC</u> factors, the parties focus on the length of the delay in

relation to the time for action contemplated by the statute.  Both parties agree that there is no

statutory timetable governing the agency action at issue.[6]  At the same time, there is no dispute

---

[6] Although acknowledging the absence of a statutory timetable, petitioners assert that the
statute, as well as the agency's own actions, contemplate that action on labor certifications will be
based on recent market data, and thus a delay of years is unreasonable.  <u>See</u> Petr.'s Reply Mem. at
5-6.  Certainly recent market data is necessary to make a well-reasoned determination, but the
statute contemplates no timetable beyond the general need for recent data -- a need common to
any good agency decisionmaking.  To the extent that outdated data is improperly used, that is
more relevant to the validity of an individual determination than to whether Congress
contemplated action within a certain time.

that the delays at issue here are substantial, ranging from two to four years.[7]  Petitioners contend

that the case law establishes that a delay in this range simply does not fit within the rule of

reason.  See MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980) (noting

that a "reasonable time" for the agency action at issue could "encompass months[], occasionally a

year or two, but not several years or a decade").

　　　　However, subsequent cases in this Circuit have made clear that measuring the delay by

years alone cannot establish unreasonable delay.  See Mashpee Wampanoag Tribal Council, Inc.

v. Norton, 336 F.3d 1094, 1102 (D.C. Cir. 2003) ("that issue [whether the delay encountered

should be deemed unreasonable] . . . cannot be decided in the abstract, by reference to some

number of months or years beyond which agency inaction is presumed to be unlawful, but will

depend in large part . . . upon the complexity of the task at hand, the significance (and

permanence) of the outcome, and the resources available to the agency"); In re Barr Lab., 930

F.2d at 75 (explaining that, although the agency missed a statutory deadline, "a finding that delay

is unreasonable does not, alone, justify judicial intervention") (emphasis added).  Thus, the Court

finds unpersuasive the handful of unpublished district court decisions in other circuits that have

---

　　　　[7]  At the motions hearing, counsel for respondents suggested that the delay attributable to
a state agency's initial processing of an application for permanent labor certification should not
be considered in determining whether mandamus is warranted against the Department of Labor
because the delay is not caused by any inaction of the Department.  However, there is no
information in the record indicating how long these applications -- or applications generally --
reside at state agencies.  Therefore, the Court is unable to carve out delays at the state level from
the overall delays in the processing of these applications.  In any event, it is questionable whether
it would be proper to exclude delays at the state level from the TRAC analysis in light of the
statute's assignment of responsibility for permanent labor certifications to the Secretary of Labor.
See 8 U.S.C. § 1182(a)(5)(A).  The Secretary's decision to create a regulatory scheme that
includes a substantial role for states would appear to make state delays relevant where the
scheme permits the delays.

granted mandamus petitions based solely on the length of a processing delay.  See Raduga USA Corp. v. U.S. Dep't of State, No. 04CV0996BTM, slip op. at 12 (S.D. Cal. May 24, 2005) (ordering consul to act on visa application because it had been pending for four years); Yasin v. Bartlett, No. H-04-994, slip op. at 3-4 (S.D. Tex. Oct. 26, 2004) (ordering Department of Labor to act on applications for permanent labor certification pending for three to six years without considering other factors); Elkhatib v. Butler, No. 04-22407, slip op. at 3 (S.D. Fla. June 6, 2005) (ordering CIS to act on application for adjustment in status because it had been pending for four years).  Indeed, courts that have looked at factors beyond merely the length of the delay have concluded that the delay was not unreasonable.  See Dioguardi Int'l, Inc. v. Chao, No. 04-1417, slip op. at 1-2 (D.D.C. Mar. 8, 2005) (denying writ to compel action on an application for permanent labor certification that had been pending for four years, based on TRAC factors); All-Pro Cleaning Servs., Inc. v. Dep't of Labor, No. H-05-250, slip op. at 22-26 (S.D. Tex. Aug. 26, 2005) (denying writ where application for permanent labor certification was pending for two years -- one year at SWA, and ten months at the Department of Labor -- after considering impact of delay and agency's competing priorities).  Thus, the Court will look to the other TRAC factors in determining whether the delays at issue here under the Department's processing structure comport with a "rule of reason."[8]

---

[8]  Petitioners' reliance on Ganem v. Heckler, 746 F.2d at 852, as the "most comparable" case is misplaced.  In Ganem, the issue presented was not one of unreasonable delay by the agency, but instead whether the agency had contravened a substantive obligation under a statute by taking a policy position that made action impossible.  See id. at 854 (discussing how Secretary's policy position on a requirement for beneficiary's receipt of social security determination "virtually assured the Secretary's inability to make a determination").

As the Court considers those other factors, the Court also weighs the projected timeline that the Department has provided.  The Department anticipates that under its streamlined system for processing permanent labor certifications all but one of the pending RIR applications will be processed within 18 months or less.  Those with a priority date between April 1, 2001 and April 1, 2002 are projected to be processed within 12 months,[9] and those with a priority date between April 1, 2002 and April 1, 2003 are projected to be processed within 18 months.[10]  See First Sierra Decl. ¶¶ 11-12; Second Sierra Decl. ¶¶ 7-8.  As for the one petitioner for whom a projected date is not available -- International Ceramica --  it can reasonably be inferred that its application, filed only two months after April 1, 2003, will be processed shortly after the 18-month date because applications are processed in the order of their priority date.  Petitioners contend that a delay of another 12 to 18 months, following the years of delay they have already endured, does nothing to alleviate the unreasonableness of the delay -- in their view, it makes it worse.  The Court disagrees.  Under the "rule of reason," the agency's provision of a projected timeline for balancing competing priorities – one that provides relief in the foreseeable future – weighs against issuance of mandamus.  See Cutler, 818 F.2d 879, 897 (D.C. Cir. 1987) (noting that in determining whether delay is unreasonable, the court "should evaluate any prospect of early completion").

_____

[9] These are the applications of petitioners Bowie Town Medical Practice, Queensway Foods, Liberty Fund, and All American Home Services.  Although All American Home Services has not yet received a continuation letter (see supra at 9), petitioner has not disputed the 12-month projection.  Of course, if a continuation letter is not forthcoming within this time period, petitioner could refile an action in this court based on this additional information.

[10] These are the applications of petitioners Shiv Traders, HSR, Inc., Alfredo Valverde, Saraswati, Inc., GC Café Arlington, ZEK, Inc., and Pisces, Inc.

16

Turning now to the other TRAC factors, the one that weighs most heavily under the circumstances of these cases is the fourth factor -- the effect of granting relief on the agency's competing priorities.  Respondents contend that the backlog of other pending applications for permanent labor certifications -- over 300,000 in April 2003[11] -- represents a series of competing priorities, which the agency has prioritized by processing on a "first-in, first out" basis, in the order of the application date.  Thus, any grant of relief to petitioners would simply move petitioners to the front of the queue, at the expense of other similarly situated applicants.  Petitioners contend that the queue is illusory because, in fact, applications are being approved that were filed anywhere from April 30, 2001, to July 1, 2002.  Despite petitioners' protestations, there is no genuine issue of material fact over respondent's adherence to a principle of "first-in, first out" processing of applications.  While petitioners are correct that some applications from 2002 have been acted upon -- a point respondents have acknowledged -- the undisputed Sierra declarations demonstrate that "most" of the petitions that are currently being processed are from late April 2001.  See First Sierra Decl. ¶ 9; Second Sierra Decl. ¶ 5.  The deviations from a pure "first-in, first-out" approach arise from the difficulty of simultaneously entering all of the applications into the backlog system and taking action on the applications, and also the sheer volume of applications.  Such deviations do not mean that the agency is not applying a "first-in, first-out" approach, but simply are a subsidiary result of transitioning a large volume of applications to the backlog system.

Petitioners also contend that many of the other applicants are not similarly situated and therefore the queue is not reasonable.  They emphasize that all of the petitioner employers in this

---

[11] See 69 Fed. Reg. 43716, 43716 (July 21, 2004)

litigation submitted RIR applications – that is, they undertook the recruitment efforts described in

20 C.F.R.§ 656.21(i) to reduce recruitment by the agency and thus enable expedition of their

applications.  Petitioners contend, quoting a Department of Labor webpage on the permanent

labor certification program, that "no queue will automatically get preference" and assert, based

on that excerpt, that there is "no allowance for the distinctions between RIR and non-RIR cases."

Petr.'s Mem. at 19.  There are two deficiencies in petitioners' argument.  The first is that the

difference between RIR and non-RIR cases is not so stark as petitioners suggest.  As respondents

note, the employer's identification of its application as an RIR case does not necessarily mean

that the Department of Labor will agree.  One of the tasks a certifying officer is assigned is to

determine whether an application has appropriately been labeled RIR.  See 20 C.F.R.

§ 656.21(I)(4).  If it is not, it is processed as a traditional application, retaining its priority date.

The second deficiency is that the webpage, viewed in full, makes clear that the Department does

have two separate queues for RIR and non-RIR cases and anticipates processing RIR cases more

quickly.[12]  See Respt.'s Reply Mem. Ex. 1.

The Department's decision on how to handle competing applications is deserving of

deference.  In analogous cases, where resource allocation is the source of the delay, courts have

declined to expedite action because of the impact on competing priorities.  For instance, in In re

Barr Lab., 930 F.2d at 75, the court declined to grant a petition for a writ of mandamus where

_____

[12]  The webpage states:  "[T]here will be two processing tracks – RIR and TR [traditional recruitment].  Each track will have a separate FIFO queue.  At the centers we will allocate resources so that RIR and TR cases receive equitable treatment in processing. . . . No queue will automatically get preference.  We plan to allocate resources based on the number of cases in each queue.  However, we anticipate that the processing time for RIR cases will be shorter than that for TR cases."  Id. at 1.

petitioner sought to compel an agency to expedite processing of its application for approval of generic drugs, despite the violation of a statutory deadline, because granting the petitioner relief would mean putting it at the head of the queue at the expense of others.  The court stated:  "[W]e have no basis for reordering agency priorities.  The agency is in a unique -- and authoritative -- position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  Id. at 76.  The court reiterated the importance of competing agency priorities in Mashpee Wampanoag Tribal Council, where it declined to issue the writ in the face of a five-year delay on a tribe's petition for federal recognition as an Indian tribe.  336 F.3d at 1101.  The court suggested that competing priorities would be the most significant factor in any case where the agency delay was due to "lack of resources" and the agency applied a "first-come" approach.  Id. at 1100 (stating that, in In re Barr Lab., "we refused to grant relief, even though all the other factors considered in TRAC favored it, where a 'judicial order putting [the petitioner] at the head of the queue [would] simply move[] all others back one space and produce[] no net gain'") (alterations in original).  Here, placing a dozen RIR cases at the front of the queue, just as in those prior cases, would produce no net gain – a dozen other RIR cases would be pushed back.

The Department's decision to consider other types of labor certifications -- those for H-1B and H-2B visa applications -- as priorities ahead of permanent labor applications is also deserving of deference.  H-1B certifications for temporary professional workers are subject to a seven-day statutory deadline (8 U.S.C. § 1182(n)(1)), and thus the Department quite reasonably gives them higher priority.  Moreover, as noted above, the Department has explained in detail its efforts to make the H-1B certification process more efficient, so that it may devote more resources to permanent labor certifications.  See Carlson Decl. ¶¶ 13-14.  H-2B certifications for

temporary nonagricultural workers, on the other hand, are subject to an internal administrative

deadline.  Although the rationale for this priority is not as apparent, petitioners have not

questioned it, and the Court declines sua sponte to question the legitimacy of that prioritization in

light of the caution in In re Barr Lab. against reallocating agency priorities.[13]

The third and fifth factors overlap -- the impact on human health and welfare and

economic harm, and the nature and extent of the interests prejudiced by the delay.  See TRAC,

750 F.2d at 80; see also Cutler, 818 F.2d at 898 ("Economic harm is clearly an important

consideration and will, in some cases, justify court intervention.").  Petitioners emphasize that the

labor certification process must be viewed in the context of the overall process for obtaining

permanent residency, and describe several economic impacts resulting from the agency's failure

to process applications -- the initial step in the process.  First, as employers seeking labor

certifications, petitioners have been unable to find willing, able, and qualified U.S. workers to fill

the vacant positions -- a demonstration required by 8 U.S.C. § 1182(a)(5)(A) -- and hence are

being deprived of the opportunity to benefit from the employee aliens' skills.  See Employer

Declarations passim; Decl. of Stuart Anderson at 9-13 (Liberty Fund Supp. Mem. Attachment

No. 1).  Many of the alien-employees, of course, also are being adversely impacted by their

inability to obtain lawful employment and associated benefits or, in the case of Dr. Morgan

(currently in the United States on an H-1B visa), by limitations on the type of work she may

accept.  Id.  The Court acknowledges that there is likely to be some adverse impact on the

---

[13]  A readily discernible rationale for placing such temporary labor certifications (which
last less than a year, see 8 C.F.R. § 214.2) ahead of permanent certifications would be the very
fact that the need for the employee is short-lived.  Thus, without an expedited decision,
temporary workers would be unlikely to receive certifications in time to undertake the jobs
before they lapsed.

employers and thus, as petitioners assert, on U.S. economic interests as a whole.  However, the magnitude of the economic impact has not been described with any specificity.  Even assuming that there is a substantial economic impact on any individual employer or employee, it is unlikely to rise to a level that would significantly change the Court's assessment of the unreasonableness of the delay in light of the importance of the agency's competing priorities.

Petitioners assert that there is an impact on human welfare because many of the aliens affected by the applications are subject to removal proceedings.  This risk has increased, they explain, as a result of a decision by the Department of State to no longer make allocations of visas for FY2005 for the third visa preference category under 8 U.S.C. § 1153(b), a category covering most of the applications at issue; petitioners expect similar limitations to continue in future years.[14]  However, as respondents correctly note, the risk of removal is a result of unlawful alien status in the United States, rather than any action by the Department of Labor.  The availability of relief under Section 245(i) does not change that.  See All Pro Cleaning Servs., Inc., slip op. at 25-26 (declining to weigh risk of deportation because alien's unlawful status was properly viewed as a result of his staying after his visa expired, rather than Department of Labor delays).

The only additional claims of impact on human welfare are specific to petitioner Alfredo Valverde and, arguably, to Liberty Fund (which asserts harm on behalf of its alien employee, Dr.

---

[14]  The declarations indicate that eight employers with pending applications are affected by this visa limitation:  Shiv Traders, HSR, Inc., Bowie Town Medical Practice, GC Café Arlington, All American Home Services, Pisces, Inc., Alfredo Valverde, and International Ceramica, Inc.  Petr.'s Mem. Ex. 1.  Only one petitioner with a pending application has directly stated that an alien "may be subject to removal proceedings" as a result of the delay, but even this declaration does not indicate that removal proceedings are imminent.  Id. Decl. of Babubhai C. Patel ¶ 8.

Morgan).[15]  Mr. Valverde and his co-applicant, Kathryn Valverde, seek to hire a "child-monitor"

to care for five children because Kathryn Valverde also must care for a parent suffering from

Alzheimer's disease.  Kathryn Valverde Decl. ¶ 5.  She has been unable to locate an able, willing,

and qualified U.S. worker, and is unable to employ her prospective hire because of the delay in

processing an application.  Although the Court does not doubt that the delay has posed a hardship

on Mr. and Ms. Valverde, it is not of a sufficient magnitude to overcome the importance of the

agency's competing priorities.

The impact alleged by Liberty Fund, on behalf of Dr. Morgan, is substantially less

serious.  Liberty Fund has submitted the declaration of Mr. Anderson, an Executive Director of

the National Foundation of American Policy, to describe the impact of the delays on Dr. Morgan.

Liberty Fund's Supp. Mem. at 6-8 & Attachment No. 1.  These impacts consist primarily of

limitations on her professional growth arising from her potential ineligibility for promotion and

her inability to change employers while her application is pending.  Anderson Decl. at 9-11.

Assuming arguendo that Mr. Anderson can properly attest to such impacts on Dr. Morgan, these

employment limitations are of the kind shared by all aliens in the queue.  Indeed, aliens without

the benefit of H-1B or similar temporary status suffer greater hardship because, unlike Dr.

Morgan, they cannot even commence lawful employment.

---

[15]  Petitioners also make brief reference to the difficulty aliens have in obtaining a driver's license or other identification without a visa number as a result of the Real ID Act of 2005, Pub. L. No. 109-13.  Petr.'s Mem. at 15-16.  Like the threat of removal proceedings, the difficulty of obtaining a driver's license is not caused by any action of the Department of Labor, but rather by petitioners' alien status.  Moreover, this difficulty is one faced by all aliens with pending applications for permanent labor certification (with the exception of those with valid temporary visas), and thus does not outweigh the agency's competing priorities.

The last TRAC principle provides that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"  750 F.2d at 80.  Conversely, the good faith of the agency in addressing the delay weighs against mandamus.  See  In re Am. Fed'n of Gov't Employees, 837 F.2d 503, 507 (D.C. Cir. 1988) (declining to issue a writ to expedite resolution of administrative appeals because, inter alia, "[the agency] has shown marked improvement in managing its docket, and there is little reason to believe that this Court's order is necessary to sustain that improvement or would be helpful in spurring greater effort").  Indeed, the agency must, at a minimum, provide a justification for the delay.  See Cutler, 818 F.2d at 898.

As explained in detail above, the explanations for the delay and the good faith efforts of the agency to reduce the backlog and rectify the delays are well-documented here.  The current backlog and resulting delays were caused by changes to Section 245(i) in 1997 and 2000 that resulted in an influx of applications for permanent labor certifications as, predictably, many aliens availed themselves of the opportunity to adjust their status to lawful permanent residency.  Although the Department of Labor was initially slow to react to the substantial increase in applications, it has, in more recent years, taken comprehensive steps to process the applications more quickly.  It has implemented automated systems to expedite the processing of certifications for H-1B visas to enable the commitment of more resources to permanent labor certifications, provided additional funding, and ultimately created two dedicated backlog centers devoted solely to processing applications for permanent labor certification.  See supra at 6-7.  Those efforts will, by respondents' estimates, meaningfully reduce the processing time for applications and enable

23

the significant backlog to be reduced over time.  Thus, the Court concludes that the good faith of

the agency weighs against mandamus.[16]

The Court recognizes that, on its face, a delay of two to four years in processing

applications for permanent labor certification appears unduly long and works a hardship on

employers and their prospective employees.  However, the competing priorities posed by the tens

of thousands of other pending permanent labor certification applications and by the H-1B and H-

2B temporary certification applications, together with the good faith efforts of the agency to

alleviate the delays, outweigh those considerations.  Hence, after careful consideration of the

TRAC principles, the Court concludes that mandamus relief is not warranted.

The only issue remaining, then, is whether the Court should, in its discretion, retain

jurisdiction over these cases to ensure that the agency continues to make progress toward

resolution of the pending applications.  See TRAC, 750 F.2d at 80 (recognizing that, even where

mandamus is not appropriate, a court may retain jurisdiction to obtain information regarding the

anticipated dates of administrative action and remain informed of an agency's progress).  The

Court finds it unnecessary to retain jurisdiction in light of the agency's prior submission of

projected dates for resolving the backlog, the agency's recent adoption of structural changes to

expedite resolution of these and other applications, and the inappropriateness of a judicial order

---

[16]  To the extent that petitioners contend that respondents could further expedite decisions
on applications by simplifying the review process -- a matter suggested at the motions hearing --
that argument is unpersuasive because it is inappropriate for a court to get involved in deciding
which processing measures are most efficient.  As the court explained in In re Barr Lab., "[t]he
agency could alleviate its own inefficiencies, perhaps through generic rulemaking, or other
simplifications of the review process -- but judges have neither the capacity nor the authority to
require such measures."  930 F.2d at 76 (citation omitted).

requiring further improvements.  See In re Barr Lab., 930 F.2d at 76 (declining to retain

jurisdiction over mandamus action where there was no other relief for the court to provide).

## **CONCLUSION**

For the foregoing reasons, the Court grants respondents' motion for summary judgment

and denies petitioners' cross-motion for summary judgment.  The petitions for writ of mandamus

are denied.  A separate order will be issued.


_____
/s/
JOHN D. BATES
United States District Judge

Date:  September 30, 2005

Copies to:

Paul Shearman Allen
James T. Reynolds
PAUL SHEARMAN ALLEN & ASSOCIATES
1329 18th Street, NW
Washington, DC 20036
Email: paulallen@drgreencard.com, jamestreynolds@drgreencard.com

Edward Lamar Allen
1400 Locust Rd., NW
Washington, DC 20012

Mark Anthony Mancini
WASSERMAN, MANCINI & CHANG
1915 I St., NW, Suite 400
Washington, DC 20006
Email:  wmclawfirm@aol.com

> *Counsel for petitioners*

Heather R. Phillips
Megan Lindholm Rose
U.S. ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
555 4th Street, NW
Washington, DC 20530
Email: heather.phillips@usdoj.gov, megan.rose@usdoj.gov

> *Counsel for respondents*